# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DOUGLAS A. WILSON, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MICROFINANCIAL INCORPORATED., PETER R. BLEYLEBEN, RICHARD F. LATOUR And JAMES R. JACKSON, JR.,<br><br>Defendants | CIVIL ACTION NO.<br>O3 cv 11883 RGS<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**Jury Trial Demanded** |

Lead Plaintiffs have alleged the following based upon the investigation of their counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by MicroFinancial Incorporated ("MicroFinancial"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, interviews with former employees of the Company (as described in Appendix A attached hereto) and Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired MicroFinancial securities between February

5, 1999, and October 30, 2002, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant MicroFinancial describes itself as a "specialized" commercial finance company that "leases equipment" and provides other financing services to businesses and consumers. The Company operates primarily through its wholly-owned subsidiary, Leasecomm Corporation ("Leasecomm"). The vast majority of the Company's leasing transactions arise from referrals by a nationwide network of purportedly "independent" vendors.

3.      Throughout the Class Period, Defendants represented that the Company's business and operations were being conducted in a profitable and lawful manner. Furthermore, Microfinancial issued highly positive earnings reports, as well as forecasts for the Company's continued growth and profitability.

4.      Unbeknownst to investors, however, Microfinancial was operating through a web of vendors which were engaged in fraudulent sales practices. As detailed herein, Microfinancial's vendors were engaged in massive and systemic fraud – in many instances, vendors were selling products that did not work or were not providing services as represented. Microfinancial then pursued customers that did not pay on their leases with a vengeance. The Company's collection efforts were extremely aggressive and included the filing of suit against customers in Massachusetts regardless of where the customer resided. Throughout the collection process, Microfinancial charged exorbitant fees, which it promptly recorded as revenue and income. The misdeeds of the Company's vendors was known to Defendants, or recklessly disregarded by them. Indeed, this is not a case where a rogue vendor or employee engaged in wrongful conduct. This is a case where a company employed a network of vendors most of

which were engaged in fraudulent selling practices and those practices had to have been known to Defendants because of the level of complaints received from customers of those vendors and the high level of defaults associated with clients of those vendors.

5.    In addition, throughout the Class Period, Microfinancial materially overstated its revenues and earnings by improperly recognizing tens of millions of dollars of financing income, fees and other revenues arising from delinquent customer accounts and defaulted commercial leasing, rental and finance contracts that Defendants knew, or recklessly disregarded, were uncollectible.  Overwhelming evidence taken from the Company's own records (produced during the course of federal and state regulatory investigations detailed below) demonstrates that Microfinancial aggressively sought to enforce contracts that Defendants knew had been obtained through misrepresentation and fraud.  Indeed, interviews conducted with former Microfinancial employees revealed that Defendants turned a blind-eye to its vendor's deceptive practices and continued to accept thousands of lease contract referrals where the default rates on the contracts often exceeded 30% and sometimes exceeded 50%. Defendants also materially understated MicroFinancial's credit losses on tens of thousands of delinquent customer accounts and certain third-party "dealer receivables" which Defendants never intended to collect but, in many instances, offset against the Company's funding of new contracts.

6.    As a result, Defendants materially misrepresented the Company's current and future revenues and profits and issued financial statements that violated generally accepted accounting principles ("GAAP") and SEC reporting requirements throughout the Class Period. *See* ¶¶ 89-161.

7.      On August 14, 2002, MicroFinancial disclosed in its Form 10-Q for the quarter ended June 30, 2002, that it was the target of a combined federal and state inquiry into the Company's leasing and credit collection practices, among other things.

8.      Then, just two months later on October 11, 2002, Microfinancial stunned the market by announcing that it was ceasing to make any new lease originations as part of a "new business strategy." The press release stated in pertinent part as follows:

> As part of this new business strategy, in recognition of the difficult financing environment, management intends to immediately de-emphasize new loan originations until new financing solutions are secured.

9.      Market reaction to the Company's "new business strategy" announcement was swift and severe. The Company's common stock lost 37% of its value to close at $2.14 per share on October 11, 2002.

10.     The Class Period ends on October 30, 2002, when Microfinancial issued a press release announcing its financial results for the period ended September 30, 2002. The Company announced, among other things, that it had recorded a "special" $35 million credit loss on its past due and delinquent "dealer receivables" and lease financing contracts. Following this announcement, the price of Microfinancial declined to $2.02 per share.

11.     Subsequently, on March 10, 2003, Microfinancial issued a press release announcing its preliminary results for the fourth quarter ending December 31, 2002. Defendants reported continuing declines in the Company's revenues and profits driven, in part, by sharply higher credit losses on the Company's dealer receivables and lease-financing contracts. The press release stated in pertinent part as follows:

- 4 -

Preliminary fourth quarter revenue for the period ended December 31, 2002 decreased 24.0%, or $8.9 million, to $28.0 million compared to $36.9 million last year. The net loss for the quarter was $7.7 million, or ($0.60) per diluted share, as compared with net income of $2.1 million, or $0.16 per diluted share in the prior year's fourth quarter. The decline in net income for the quarter is primarily the result of a 30.4% decline in lease and loan revenues to $11.2 million, a 46.1% decline in service fee and other revenues to $4.0 million, *and a 32.7% increase in the provision for credit losses to $22.5 million* as compared with the fourth quarter ended December 31, 2001. [Emphasis added.]

12.     On or about May 22, 2003, the Federal Trade Commission ("FTC") and several states filed civil actions against the Company. In particular, the FTC action sought *"to secure preliminary and permanent injunctive relief, including rescission of contracts, cessation of collections and other equitable relief, for defendants' unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a),"* among other things. [Emphasis added.]

13.     On May 29, 2003, Microfinancial issued a press release which announced the settlement of the FTC and state actions. The press release stated, in pertinent part, as follows:

> "We are pleased to have resolved this costly and time consuming matter which has been ongoing for well over a year. Many of the issues raised were not due to Leasecomm's activities, but were attributable to the acts and statements of independent vendors and dealers. For the record, while we never sold equipment directly, we felt it was in our best interest to settle because it was the only cost-effective solution that enables the Company to move forward and focus on business."

14.     The full extent of the Company's massive fraud became clear in the FTC's press release of May 29, 2003, announcing terms of the settlement agreement between defendants and the FTC:

> [... The Company that ...] allegedly used shady agents, deceptive contracts, and false claims to target thousands of would-be entrepreneurs will cancel $24 million in judgments allegedly obtained through deception and will reform all

business opportunity financing contracts to settle charges by the Federal Trade Commission and an eight state task force that the practices violated federal and state laws.

\* \* \* \* \*

"Leasecomm knowingly participated in a scheme that used the 'get-rich-quick' allure of selling products on the Internet to take advantage of thousands of consumers who were ultimately forced into debt," Massachusetts Attorney General Tom Reilly said. "This agreement relieves the debts of customers who fell prey to these 'business opportunities' and helps protect future consumers by requiring Leasecomm to change its business practices."

\* \* \* \* \*

Leasecomm drafted its contracts to ensure that customers paid even when the vendors used misrepresentations or fraud, or when the products or services failed to perform as represented, according to the FTC complaint. The FTC alleges that Leasecomm knows or should know that many of its vendors engage in deceptive practices to sell their business ventures. In one case, a vendor signed up 1,882 consumers for a "business opportunity,"and nearly 1,500 went into default, the complaint alleges. Nevertheless, Leasecomm aggressively collected from many of those customers. Leasecomm pursues its customers "even when the customers have been defrauded and received nothing of value," the complaint alleges.

\* \* \* \* \*

According to the FTC, when consumers failed to pay, Leasecomm sued them. The FTC alleges that Leasecomm has sued over 27,000 consumers in the past three years in Massachusetts courts, and, as of January, had 2,200 suits pending. Few of the customers could afford the expense of litigation in a distant city and most suffered default judgments the FTC alleges. *Although Leasecomm files its suits in Massachusetts, it aggressively enforces its judgments in the consumer's local forum. "Had Leasecomm filed the suits in the local forum in the first instance, customers might have been able to appear and present a defense,"* the complaint says. According to the FTC, *Leasecomm adds to the consumer injury by imposing high collection fees, not only for late payments, but for every collection call it makes and letter it sends.* These practices substantially increase the total payments due under the Leasecomm contract, the complaint says. [Emphasis added.]

15.     During the Class Period, prior to the disclosure of the true facts about the

Company MicroFinancial completed its IPO generating over $49.7 million in proceeds and,

MicroFinancial insiders, including certain of the Individual Defendants (defined below), sold

over 814,000 shares of their personally-held MicroFinancial common stock to the investing

public at artificially inflated prices, realizing over $11.2 million in illicit proceeds.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Securities Exchange Act of 1934, as amended (the "Exchange Act") [15 U.S.C. §§ 78j(b) and

78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission

("SEC") [17 C.F.R. § 240.10b-5].

17.     This Court has jurisdiction of this action pursuant to Section 27 of the Exchange

Act [15 U.S.C. § 78aa] and 28 U.S.C. §§ 1331 and 1337.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

U.S.C. § 1391(b) and (c). MicroFinancial maintains its headquarters in this District and many of

the acts and wrongs complained of herein occurred in this District.

19.     In connection with the acts and conduct alleged in this Complaint, defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including the

mails and telephonic communications and the facilities of the New York Stock Exchange (the

"NYSE"), a national securities exchange.

## PARTIES

20.     Lead Plaintiffs the Louisiana State Employees' Retirement System and Hardy W.

Hall (the "Lead Plaintiffs" or "plaintiffs") purchased the securities of MicroFinancial at

artificially inflated prices during the Class Period and have been damaged thereby. Lead Plaintiffs' certifications have been previously filed in this litigation and are hereby incorporated by reference.

21.     Defendant MicroFinancial is a Massachusetts corporation with its principal executive offices at 10M Commerce Way, Woburn, Massachusetts. MicroFinancial is a commercial finance company that purportedly leases and rents "microticket" equipment and provides other financing services.

22.     (a) Defendant Peter R. Bleyleben ("Bleyleben"), was, at certain times pertinent to this action, MicroFinancial's Chief Executive Officer, President and Chairman of the Company's Board of Directors.

(b) Defendant Richard F. Latour ("Latour") was, at certain times pertinent to this action, MicroFinancial's President, Chief Operating Officer, Chief Financial Officer and a Director.

(c) Defendant James R. Jackson, Jr. ("Jackson') was, at certain times pertinent to this action, MicroFinancial's Chief Financial Officer and Vice President.

(d) Defendant Brian E. Boyle ("Boyle") was, at certain times pertinent to this action, a Director of the Company. Mr. Boyle was the Chief Executive Officer of the Company from 1985 to 1987 and Chairman of the Board of Directors from 1985 to 1995.

(e) Defendants Bleyleben, Latour, Jackson and Boyle are referred to collectively herein as the "Individual Defendants."

23.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations,

- 8 -

operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

24.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day opera-tions of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

25.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal

- 9 -

securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with MicroFinancial, each of the Individual Defendants had access to the adverse undisclosed information about MicroFinancial's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about MicroFinancial and its business issued or adopted by the Company materially false and misleading.

27.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged

- 10 -

herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

28.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of MicroFinancial securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding MicroFinancial's business, sales practices, operations and the intrinsic value of MicroFinancial common stock; (ii) allowed defendants to successfully complete an initial public offering of MicroFinancial stock generating proceeds of approximately $49.7 million for the Company; (iii) enabled certain MicroFinancial insiders, including defendants Bleyleben, Latour, and Boyle, to collectively sell more than $11.2 million of their personally-held MicroFinancial common stock to the unsuspecting market; and (iv) caused plaintiffs and other members of the Class to purchase MicroFinancial common stock at artificially inflated prices.

29.    Defendant Deloitte & Touche LLP ("D&T") is a firm of certified public accountants that audited MicroFinancial's financial statements during the Class Period and issued materially false and misleading audit opinions on these financial statements. Deloitte Touche also consented to the use of its opinion on MicroFinancial's financial statements filed with the SEC and otherwise disseminated to the investing public during the Class Period. Deloitte Touche's participation in the materially false and misleading statements and omissions alleged herein is described in ¶¶ 162- 185.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) individually and on behalf of all persons, other than defendants, who purchased the securities of MicroFinancial during the Class Period and who were damaged thereby. Excluded from the Class are defendants herein, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

31.     The members of the Class are so numerous that joinder of all members is impracticable. MicroFinancial sold 3.4 million shares of MicroFinancial common stock to members of the investing public in the IPO and the stock of Microfinancial was actively on the NYSE during the Class Period. The precise number of Class members is unknown to plaintiffs at this time but are believed to number in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of MicroFinancial or its transfer agent and the underwriters of the IPO. Notice can be provided to such record owners by a combination of published notice and first-class mail using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

32.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

- 12 -

33.    Plaintiffs' claims are typical of the claims of the other members of the Class because plaintiffs' and all the class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

34.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

35.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

    i.    Whether the federal securities laws were violated by defendants' acts as alleged herein;

    ii.    Whether defendants issued and disseminated statements that were materially false and misleading;

    iii.    The extent of injuries sustained by members of the Class and the appropriate measure of damages; and

    iv.    Whether defendants acted with scienter.

## SUBSTANTIVE ALLEGATIONS

### Background: The Government Investigations

36.    Defendant MicroFinancial describes itself as a "specialized" commercial finance company that "leases equipment" and provides other financing services to businesses and consumers. The Company operates primarily through its wholly-owned subsidiary, Leasecomm. The vast majority of the Company's leasing transactions arise from referrals by a nationwide network of purportedly "independent" vendors.

37.    As disclosed by the Company for the first time on August 14, 2002, MicroFinancial's leasing-financing and credit collection practices became the focus of an extensive FTC civil investigation, as well as civil investigations by several state Attorneys General and other local law enforcement officials (the "Government Investigations"). The Government Investigations centered on the Company's financing of purported "business opportunity" leases. According to the Government Investigations, the Company's authorized dealers or vendors sold internet-based turn-key "business opportunities," which were nothing more than 'get-rich-quick' schemes designed to promote the Company's financing of the transactions. According to the Government Investigations, consumers who signed contracts with the Company based on the dealer's misrepresentations, often received nothing of value, but were then obligated to pay thousands of dollars in 'lease payments' to the Company. When the defrauded consumers stopped making payments under the contracts, the Company immediately began an aggressive collection process culminating in the Company's bringing suit against the consumer in Massachusetts. During the "collection" process the Company continued to bill and accrue contractual revenues for these delinquent accounts for at least a year and in addition

- 14 -

recorded "fee" income for every collection letter, telephone call and dunning notice sent which

amounted to millions of dollars per year. The Government Investigations estimated that over one

three year period, from 2000 to 2002, the Company sued over 27,000 lessees of the Company's

products.

## Defendants' Misrepresentations and Omissions
## Concerning The Company's Lease-Financing Practices

38.    At all relevant times, MicroFinancial represented that the credit risks associated

with the its lease-financing activities were under the constant review of management and

reflected advanced risk evaluation techniques using the Company's "proprietary" credit scoring

systems and "complex" lease-pricing models. Indeed, according to the Company's 1998 Annual

Form 10-K, these advanced credit granting techniques allowed it to target *"owner-operated or*

*other small commercial enterprises, with little business credit history and limited or poor*

*personal credit history at the owner level."* [Emphasis added.]

39.    In fact, however, MicroFinancial's financing practices amounted to nothing more

than a grist-mill through which hundreds of thousands of small and home business owners were

duped into signing long-term "lease" contacts for equipment and services that were often entirely

worthless or at the very least, worth thousands of dollars less than the defrauded lessee's

contractual obligations. According to defendants's own admissions,[1] since its founding in 1986,

MicroFinancial has financed more than 691,000 leases and has commenced 92,271 contract

actions due to subsequent defaults. The recently concluded Government Investigations further

---

[1] Defendants also admitted that in the more than 92,000 contract actions due to the onerous forum selection clause in the Company's lease agreements only 1,654 lessees answered the complaints. *See Leasecomm Corp. v. Crawford*, 2003 Mass. App. Div. 58 (Mass. App. Div., 2003)

revealed that 27,000 of these contract actions were brought during the three year period from 2000 to 2002 alone, revealing a rapidly accelerating rate of delinquency that had nearly doubled from a historical average of 4,600 contract actions during the Company's first 14 years to an average of 9,000 actions annually during 2000 through 2002. These statistics alone are undeniable evidence that defendants either knowingly or recklessly ignored any sound business risk analysis with regard to MicroFinancial's extension of credit. As a result, each of defendants publicly disseminated Class Period statements concerning the Company's purported credit evaluation techniques were materially false and misleading.

40.     Moreover, several former employees of the Company whose responsibilities included credit extension and collection activities, during the relevant time period, confirmed that any meaningful "credit analysis" of the risks associated with a potential lease transaction was virtually non-existent. For example:

> A former dealer service representative, CI 1, stated, "[For] credit card terminals - almost everybody got approved. [J]ust short filing bankruptcy a month ago, everyone was approved. They [defendants] were approving [credit for] on-line stuff. [W]hen they were approving [credit for] web sites and all that kind of crap... that was a huge ripoff... that was just murderous. There were fraudulent agents out in the field, selling business opportunities on-line and all this other crap."

> A former collections agent, CI 2, stated, "Basically, [defendants] knew they were approving people who they knew were lying on their credit applications."

> A former credit and sales support manager, CI 3, stated, "I did review the credit of different vendors and ... if you denied a credit score - they were not happy about it - and they would come and complain ... and because they were a particular vendor you would have to approve it..."

> A former customer service representative, CI 4 stated, "People {who were approved had] the most horrible credit. It is a fact that [defendants] knew that [the lessee] probably wouldn't pay and then [the Company] would take them to court and win on default. That's how [...] Leasecomm made their money.

- 16 -

**Defendants' Misrepresentations And Omissions Concerning
MicroFinancial's Fraudulent Billing and Collection Practices**

41.     At all relevant times, MicroFinancial's SEC filings described the Company's

highly automated billing and collection practices as a key component of the Company's success.

The Company's quarterly earnings releases often touted "record revenues" and double-digit

increases in the Company's fees and revenues. Indeed, the Company's annual SEC filings on

Form 10-K from 1998 through 2001, purported to show that the Company's "other income" had

nearly doubled from $18.2 million in 1998 to more than $36.8 million during 2001, due in

material part to the Company's billing and collection practices.

42.     Defendants misrepresentations and omissions concerning the Company's doubling

of its revenues during the Class Period materially misled investors concerning the Company's

current and future profitably and artificially inflated the price of MicroFinancial securities at all

relevant times. As detailed herein, defendants charade of profitability came to a sudden halt

when the FTC and various states filed enforcement actions against the Company in May 2003.

While a clearer picture of the Company's actual profitability does emerge from the Company's

2003 Form 10-K filed with the SEC on March 30, 2004, wherein the Company reported

operating losses of more than $26 million and a decrease in "other revenues" to pre-1998 levels

of $17.7 million, defendants have never restated their financial statements from 1998 to 2001 and

continue to mislead investors concerning the true nature of the Company's financial results

during those years.

43.     That the Company's improper billing for late fees and unlawful collection

practices grossly inflated the Company's financial results was confirmed by several of the

Company's former employees. According to CI 4, a former customer service representative,

Leasecomm charged excessive fees for loan defaults and attempted to collect these fees directly

from the lessee's bank account in instances where the lessee had purportedly agreed to make

payments directly from a particular account. The Company charged an additional fee every time

it attempted to withdraw money from an individual's account to collect late fees. CI 6, a former

collections agent, stated that lessee's were also charged additional fees every time a collection

letter was sent. "Anything that had been done with the account there was a $5 charge or a $10

charge that kept accruing. . . . These were people that were already in default." CW 7, a former

operation supervisor stated that Leasecomm's collections computer was programmed to

repeatedly attempt to withdraw money from lessees' bank accounts, even if there was insufficient

funds in the account, which often times caused such accounts to become overdrawn. CI 7, a

former operations supervisor for the Company, fielded numerous calls from irate lessee's

concerning such onerous and unlawful practices.

### Defendants' Knowledge Of The Fraudulent Business Practices of MicroFinancial's Vendors

44.    At all relevant times, defendants represented that the Company's network of

independent dealers underwent both an initial screening process and an "ongoing evaluation"

process, which purportedly included an examination of dealer portfolio performance, lessee

complaints, cases of fraud or misrepresentation, aging studies, number of applications and

conversion rates for applications. According to defendants' SEC filings and other public

statements, *"This ongoing assessment enables the Company to manage its Dealer*

*relationships, including ending relationships with poor-performing Dealers."* [Emphasis added.] Defendants failed to disclose however, that despite possessing evidence of serious problems with its dealers, the Company rarely terminated it relationship with any of its dealers. Instead, the Company continued accepting business from poor performing vendors and simply reduced the payment it made to the vendor, retaining a larger share of the customers' payments for itself.

45.    Company documents produced during the course of the Government Investigations revealed that defendants closely monitored computerized systems which tracked delinquent accounts, default rates, and customer complaints of vendor fraud or misrepresentation. The documents revealed that the default rate with respect to particular business ventures often exceeded 30%, and with some vendors exceeded 50%. The documents also revealed that defendants were receiving large numbers of customer complaints about misrepresentations or fraud concerning these business ventures and vendors. Yet, MicroFinancial took no effective action– either to end its relationship with these vendors or discontinue solicitation of the business venture. As a result each of the defendants' representations concerning the Company's monitoring and/or assessment of the performance of it independent vendors was materially false and misleading.

46.    The following examples set out some of the more egregious examples of the defendants' misrepresentations and omissions concerning certain of the Company's vendor relationships.

47.    **InfoDirect, Inc.** – During the Class Period, MicroFinancial financed more than 1,800 computer leases sold by InfoDirect to participants in what the Government Investigations

concluded was nothing more than a "pyramid scheme." The Company's "dealer portfolio performance" reports examined by defendants on an on-going basis revealed that more than 1,400 of the InfoDirect lease contracts went into default early in the lease term. Furthermore, Company complaint files produced during the course of the Government Investigations revealed that the computers, when delivered at all, were 'second-hand' low-end machines that were often defective – and worth far less than the thousands of dollars the Company charged through its lease agreements. Yet, the only action taken by MicroFinancial, in response to the hundreds of InfoDirect complaints received, was to write letters to InfoDirect complaining about the poor performance rate on the leases. Company documents further revealed that despite being on notice that there were serious problems with InfoDirect's performance, MicroFinancial continued to finance InfoDirect business for nearly a year.[2] According to documents filed with the California Secretary of State, InfoDirect's status as an active corporate entity was suspended during September 2000. MicroFinancial went on to sue at least one-third of the defaulted InfoDirect lessees for non-payment.

48.    **Executive Credit Services, Inc.** – According to the Government Investigations, Executive Credit Services (or E-commerce Exchange Worldwide or ePenzio, as it was sometimes known) was a seminar marketer of virtual terminals and accounted for $16 million of the Company's lease-financing volume during 1999-2000, with 9,000 customers and a

---

[2] Defendants were also on notice that in November 1998, InfoDirect and its organizers – Jason McComb and Thomas Fletcher – were charged by the FTC with deceptive trade practices, which included unauthorized charges to consumer checking and credit accounts in connection with a "how to guide" marketing scheme concerning government auctions. A consent order barring InfoDirect and its principals from engaging in those activities settled the suit in April of 1999. *See FTC, et al v. Infodirect Inc, et al,* 2:98cv09274, C. D. Cal. (Nov. 18, 1998)

default rate of over 30%. Again, Company documents produced during the course of the

Government Investigations revealed that defendants were on notice of thousands of complaints

about ePenzio's software and websites never working. The documents also revealed that

MicroFinancial rejected virtually every claim.

49.     Moreover, plaintiffs' investigation revealed that seminar marketers such as

ePenzio routinely obtained signatures on the Company's lease agreements using fraudulent

means – a fact that was generally known throughout the Company. A former MicroFinancial

customer service representative, CI 4, recounted the "sign-up" process in this manner, stating:

> But what the vendor did to my knowledge, or what a lot of the vendors would do,
> is you know have a clip board and say sign here, here and here and people
> wouldn't see the Leasecomm lease agreements. So then they would get a welcome
> letter from us, and they would call us and say 'who the hell are you.'

50.     Furthermore, the Company's Form-10K for the years 1998, 1999 and 2000

misleadingly disclose that "E-Commerce" was the Company's single largest customer in each of

those years – while omitting any information concerning the thousands of complaints the

Company received concerning its E-Commerce business or that the Company was experiencing

extraordinarily high default rates on its E-Commerce portfolio. The fact that E-Commerce was

the Company's single largest customer coupled with the Company's material omissions in its

Form 10-K reports is highly probative of Defendants' scienter in this matter. Thus, it is not

surprising with regard to the Company's financing of virtual terminals that CI 4 commented

further, stating:

> [Defendant] Peter Bleyleben knew exactly what was going on. I mean I use to
> deal with the legal department all the time. I mean everybody knew. [E]verybody
> in that Company knew exactly what was going on. Everybody that worked there