1) The selection of and changes in *significant accounting policies* or their application;

2) *The effect of MicroFinancial's accounting policies on revenue recognition*;

3) *D&T's judgments about the quality, not just the acceptability, of the MicroFinancial's accounting principles* as applied in its financial reporting;

4) *Any disagreements with the Company's management on the application of accounting principles relative to entity specific transactions*;

5) Any consultations with other accountants about auditing and accounting matters;

6) Any significant unusual transactions;

7) Any material financial statement misstatement;

8) MicroFinancial's internal control polices and procedures;

9) The disclosure that accompanied MicroFinancial's financial statement including its Management's Discussion and Analysis contained in the Company's Forms 10-K and 10-Q;

10) MicroFinancial's management's accounting judgements, estimates and uncertainties; and

11) Any D&T audit adjustments.

175. MicroFinancial's 2001 and 2002 proxy statement disclosed that its Audit Committee discussed the above matters with D&T. In addition, MicroFinancial's 2001 and 2002 proxy statement disclosed that:

1) *Its Audit Committee met and held discussions with D&T about the matters enumerated in the proceeding paragraph*; and

2) The Audit Committee discussed D&T's independence.

176.  Nonetheless, MicroFinancial issued materially false and misleading financial statements during the Class Period that D&T knowingly, or recklessly falsely certified as being presented in conformity with GAAP. In fact, MicroFinancial's Audit Committee discussed the above matters with D&T after the Company had been notified that Federal and numerous State governmental agencies were investigating the Company's business and billing practices. Such investigations required D&T to be ever more vigilant in its audit of MicroFinancial's financial statements and to reassess the propriety of the Company's financial reporting, which D&T did not.

177.  During the Class Period, the following unqualified false and misleading D&T audit reports, which stated that MicroFinancial's financial statements were presented in conformity with GAAP and that D&T's audit was performed in accordance with GAAS, were filed with the SEC:[13]

2000

> We have audited the accompanying consolidated balance sheet of MicroFinancial Incorporated (the "Company") as of December 31, 2000, and the related consolidated statements of operations, stockholders' equity, and cash flows for the year then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit. The financial statements of the Company for the years ended December 31, 1999 and 1998 were audited by other auditors whose report, dated February 21, 2000, expressed an unqualified opinion on those statements.
>
> We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are

---

[13]  D&T's unqualified audit report on MicroFinancial's fiscal 2002 financial statements were also false and misleading in that it improperly reaffirmed MicroFinancial's false and misleading 2001 year-end financial statements, as alleged herein.

> free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.
>
> In our opinion, such 2000 financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2000, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

2001

> We have audited the accompanying consolidated balance sheets of MicroFinancial Incorporated and subsidiaries (the "Company") as of December 31, 2000 and 2001, and the related consolidated statements of operations, stockholders' equity, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2000 and 2001, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

178.    In issuing unqualified audit opinions on MicroFinancial's annual financial statements during the Class Period, D&T knew or recklessly disregarded that such financial statements violated numerous provisions of GAAP and were materially false and misleading and

inherently unreliable as set forth in ¶¶ 82-163 above.

179.    ***In fact, D&T was put on notice that MicroFinancial's financial reporting practices were problematic, as MicroFinancial was notified that numerous governmental agencies were auditing the Company's business and billing practices.***

180.    In certifying such financial statements, D&T also falsely represented that its audit was conducted in accordance with GAAS. These statements were materially false and misleading in that the audit conducted by D&T was knowingly or recklessly not performed in accordance with GAAS in the following respects:

(1)    D&T violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP. D&T's opinion falsely represented that MicroFinancial's 2000 and 2001 financial statements were presented in conformity with GAAP when they were not for the reasons herein alleged;

(2)    D&T violated GAAS Standard of Reporting No. 4 which requires that, when an opinion on the financial statements as a whole can not be expressed, the reasons therefor must be stated. D&T was required to have stated that no opinion could be issued by it on MicroFinancial's , 2000 and 2002 financial statements or issued an adverse opinion stating that such financial statements were not fairly presented. D&T also failed to require MicroFinancial to restate its Class Period financial statements to correct the Company's improper reporting of revenue and uncollectible receivables and allowed MicroFinancial to make material financial misrepresentations to its shareholders and the public during the Class Period. D&T's failure to make such a qualification, correction, modification and/or withdrawal of its audit opinions was a violation of GAAS, including the fourth standard of reporting;

(3) D&T violated GAAS General Standard No.2 which requires that an independence in mental attitude is to be maintained by the auditor in all matters related to the assignment;

(4) D&T violated GAAS and the standards set forth in SAS No. 1 and SAS No. 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements;

(5) D&T violated GAAS General Standard No. 3 that requires that due professional care must be exercised by the auditor in the performance of the audit and the preparation of the audit report;

(6) D&T violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be performed. AU § 150.02. In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure: the control environment, the accounting system, and control procedures. AU § 319.02. The control environment, which includes management's integrity and ethical values, is the foundation of internal control and provides discipline, structure and sets the tone of an organization. After

obtaining an understanding of an entity's internal control structure, the auditor assesses the entity's control risk. AU § 319.02. Control risk is the risk that a material misstatement in an assertion by management contained in a company's financial statements will not be prevented or detected on a timely basis by an entity's internal control structure policies or procedures. AU § 319.29. The ultimate purpose of assessing control risk is to aid the auditor in evaluating the risk that material misstatements exist in the financial statements. AU § 319.61. The failure to properly evaluate the Company's internal control procedures associated with the recognition of revenue and uncollectible accounts receivable was a violation of GAAS;

(7) D&T violated Standard of Field Work No. 3, which requires sufficient competent evidential matter to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. D&T knew or recklessly disregarded that it did not obtain sufficient competent evidential matter as to MicroFinancial's reported Class Period revenues, uncollectible receivables or financial statement disclosures;

(8) D&T violated auditing standard AU § 342 in that it failed to perform the audit procedure required to determine that MicroFinancial's accounting estimates, including the Company's reserve for uncollectible accounts, were adequate. AU § 342 provides that in establishing the reasonableness of an accounting estimate, the auditor normally concentrates on key factors and assumptions including the significance of the accounting estimate and its susceptibility to misstatement and bias. As noted above, GAAP requires an entity's bad debt reserve to reflect, at a given point in time, the estimated probable loss inherent in the entity's receivables and further provides that events that occur subsequent to the balance sheet date, but

prior to the issuance of the financial statements, provide additional evidence with respect to conditions that existed on the balance sheet date and affect the estimates inherent in the process of preparing financial statements. Nonetheless, during the Class Period, D&T falsely certified that MicroFinancial's receivables, were fairly stated, when they were not, as D&T knew or recklessly disregarded;

(9) D&T violated auditing standard AU § 431 which provides that if management omits from the financial statements, including the accompanying notes, information that is required by generally accepted accounting principles, the auditor should express a qualified or an adverse opinion and should provide the information in his report;

(10) D&T violated auditing standard AU § 330 which requires auditors to confirm accounts receivables. Had it done so, D&T would have learned, if it didn't already know, about the problems associated with the collectibility of the Company's receivables; and

(11) D&T violated auditing standard AU § 508 which requires auditors to issue a qualified or adverse opinion when inappropriate accounting principles causes a client's financial statements to be materially misstated.

181. D&T's opinions, which represented that each of MicroFinancial's 2000 and 2001 financial statements were presented in conformity with GAAP, were materially false and misleading because D&T knew or was reckless in not knowing that such financial statements violated the principles of fair reporting and GAAP. In the course of rendering its unqualified audit certifications on MicroFinancial's 2000 and 2001 financial statements, D&T knew it was required by GAAS to obtain reasonable assurance about whether the financial statements were free of material misstatement and was required to adhere to each of the herein described

standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. D&T also was required by GAAS to exercise professional skepticism, a process that requires a questioning mind, including an increased recognition of the need to corroborate management representations and explanations. D&T, in issuing and reissuing its unqualified opinions, knew or recklessly disregarded that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certification knowing or recklessly disregarding that GAAS had been violated.

182.  D&T's unqualified opinion on MicroFinancial's 2002 and 2001 year-end financial statements updated and reaffirmed D&T's unqualified opinion on MicroFinancial's fiscal 2001 year-end financial statements. At the time D&T reaffirmed its unqualified opinion on MicroFinancial's fiscal 2001 year-end financial statements, it was on notice that numerous governmental agencies were investigating MicroFinancial's billing and business practices. ***Accordingly, D&T was on constructive notice, if it didn't already know, that MicroFinancial's recognition of revenue during the Class Period may have been improper.***

183.  Nonetheless, D&T improperly failed to take the steps required by GAAS in connection with MicroFinancial's failure to correct its misstated Class Period financial statements.

184.  As a result of its failure to accurately report on MicroFinancial's Class Period financial statements, D&T utterly failed in its role as an auditor as defined by the SEC. SEC Accounting Series Release No. 296, *Relationships Between Registrants and Independent Accountants*, Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of

investors in financial reporting. An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. ***Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised.*** The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result. [Emphasis added.]

## ADDITIONAL SCIENTER ALLEGATIONS

185.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding MicroFinancial, their control over, and/or receipt and/or modification of MicroFinancial's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning MicroFinancial, participated in the fraudulent scheme alleged herein.

186.    While defendants were issuing false and misleading statements about MicroFinancial and its business: (i) the Company completed an IPO for 47.9 million; and (ii) certain of the the Individual Defendants, together with other high-level MicroFinancial insiders, directly or indirectly, disposed of over $11.2 million worth of personally-held stock, benefitting

from the artificial inflation in MicroFinancial's stock price their fraudulent scheme had created. The Individual Defendants and other insiders sold shares during the Class Period as follows:

| Insider | Date of Sale | Shares | Price | Proceeds |
|---|---|---|---|---|
| Peter R. Bleyleben, Chairman | on or about 2/5/99 | 129,550 | $15.00 | $1,943,250.00 |
| | 5/18/01 - 5/31/01 | 53,600 | $14.40 | $771,840.00 |
| | 6/1/01 - 6/29/01 | 8,400 | $13.10 | $110,040.00 |
| | 7/2/01 - 7/31/01 | 8,400 | $14.77 | $124,068.00 |
| | 8/1/01 - 8/31/01 | 9,200 | $12.35 | $113,620.00 |
| | 9/4/01 - 9/28/01 | 6,000 | $12.53 | $75,180.00 |
| | 10/1/01 - 10/31/01 | 9,200 | $9.90 | $91,080.00 |
| | 11/1/01 - 11/30/01 | 8,400 | $9.38 | $78,792.00 |
| | 12/3/01 - 12/31/01 | 8,000 | $9.48 | $75,840.00 |
| | ½/02 - 1/31/02 | 8,400 | $8.50 | $71,400.00 |
| | 2/1/02 - 2/28/02 | 8,000 | $6.96 | $55,680.00 |
| | 4/1/02 - 4/30/02 | 8,800 | $8.11 | $71,368.00 |
| | 5/1/02 - 5/15/02 | 4,400 | $8.50 | $37,400.00 |
| Total | | 270,350 | | $3,619,558.00 |
| Richard F. Latour, COO | on or about 2/5/99 | 35,450 | $15.00 | $531,750.00 |
| | 5/16/01 - 5/23/01 | 15,000 | $14.05 | $210,750.00 |
| | 9/5/01 | 5,000 | $13.59 | $67,950.00 |
| Total | | 55,450 | | $810,450.00 |
| Torrence C. Harder, Director | on or about 2/5/99 | 130,250 | $15.00 | $1,953,750.00 |
| | 6/4/01 | 5,000 | $15.80 | $79,000.00 |
| | 7/31/01 | 5,000 | $14.60 | $73,000.00 |
| | 8/1/01 - 8/31/01 | 78,500 | $12.51 | $982,035.00 |
| | 9/4/01 - 9/10/01 | 17,400 | $13.45 | $234,030.00 |
| Total | | 236,150 | | $3,321,815.00 |
| Steven J. Lacreta, Officer | 7/30/01 | 6,000 | $15.41 | $92,460.00 |

| | | | | |
|---|---|---:|---:|---:|
| John R. Plumlee, Officer | on or about 2/5/99 | 3,725 | $15.00 | $55,875.00 |
| | 8/27/01 - 8/28/01 | 6,000 | $12.50 | $75,000.00 |
| | 11/2/01 - 11/12/01 | 11,940 | $10.00 | $119,400.00 |
| Total | | 21,665 | | $250,275.00 |
| | | | | |
| Brian E. Boyle, Director | on or about 2/5/99 | 198,550 | $15.00 | $2,978,250.00 |
| | 6/12/02 - 6/24/02 | 9,000 | $7.60 | $68,400.00 |
| | 9/16/02 | 3,000 | $5.06 | $15,180.00 |
| | 9/23/02 | 3,000 | $4.71 | $14,130.00 |
| | 9/30/02 | 3,000 | $4.48 | $13,440.00 |
| | 10/7/02 | 3,000 | $4.00 | $12,000.00 |
| | 10/14/02 | 3,000 | $1.94 | $5,820.00 |
| Total | | 222,550 | | $247,470.00 |
| | | | | |
| Stephen Obana, VP of Leasecomm | on or about 2/5/99 | 1,950 | $15.00 | $29,250.00 |
| Grand Total | | 814,115 | $10.28 | $8,371,278.00 |

## Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

187.  At all relevant times, the market for MicroFinancial's securities was an efficient market for the following reasons, among others:

(a) MicroFinancial's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, MicroFinancial filed periodic public reports with the SEC and the NYSE;

(c) MicroFinancial regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

   (d) MicroFinancial was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

  188. As a result of the foregoing, the market for MicroFinancial's securities promptly digested current information regarding MicroFinancial from all publicly available sources and reflected such information in MicroFinancial's stock price. Under these circumstances, all purchasers of MicroFinancial's securities during the Class Period suffered similar injury through their purchase of MicroFinancial's securities at artificially inflated prices and a presumption of reliance applies.

### **NO SAFE HARBOR**

  189. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those

forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of MicroFinancial who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

190. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

191. During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) enable the Individual Defendants and other MicroFinancial insiders to sell more than $6.8 million worth of their personally-held shares of MicroFinancial common stock at artificially inflated prices; and (iii) cause plaintiffs and other members of the Class to purchase MicroFinancial's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

192. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for MicroFinancial's securities in violation of Section

10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

193. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of MicroFinancial as specified herein.

194. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MicroFinancial's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MicroFinancial and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MicroFinancial securities during the Class Period.

195. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and

participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew, or recklessly disregarded, was materially false and misleading.

196.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing MicroFinancial's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

197.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MicroFinancial's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of MicroFinancial's publicly-traded securities were artificially inflated, and relying

directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired MicroFinancial securities during the Class Period at artificially high prices and were damaged thereby.

198.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that MicroFinancial was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their MicroFinancial securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

199.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

200.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

201. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

202. The Individual Defendants acted as controlling persons of MicroFinancial within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

203. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

204. As set forth above, MicroFinancial and the Individual Defendants each violated

Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiffs and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: April 21, 2004

By: /s/ Matt Smith

Thomas G. Shapiro BBO #454680
Theodore M. Hess-Mahan BBO #557109
Matthew L. Tuccillo BBO #643336
**SHAPIRO, HABER & URMY**
75 State Street
Boston MA 02109
(617) 439-3939

**CAULEY GELLER BOWMAN & RUDMAN LLP**
Samuel H. Rudman
Russell J. Gunyan
200 Broadhollow Road, Suite 406
Melville, New York 11747
(631) 367-7100

**SCHIFFRIN & BARROWAY**
Marc Willner
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
(610) 667-7706

**Attorneys for Plaintiffs**

- 100 -